## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RITE AID OF PENNSYLVANIA, INC.,** | : | **CIVIL ACTION NO. 1:08-CV-0033** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED FOOD AND COMMERCIAL** | : | |
| **WORKERS UNION, LOCAL 1776,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Rite Aid of Pennsylvania, Inc. (hereinafter "Rite Aid" or "the company") initiated this declaratory judgment action[1] challenging the arbitrability of grievances filed under three collective bargaining agreements ("CBAs") by defendant United Food and Commercial Workers Union, Local 1776 (hereinafter "Local 1776" or "the union").  In late September 2007, representatives of Local 1776 entered six non-union stores newly acquired by Rite Aid for the purpose of

---

[1]The court's subject matter jurisdiction over this action derives from § 301(a) of the Labor Management Relations Act, which provides, in pertinent part, as follows:

> Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a); see also Mack Trucks, Inc. v. Int'l Union, United Auto, Aerospace & Agric. Implement Workers, 856 F.2d 579, 583-90 (3d Cir. 1988) (holding that § 301(a) confers jurisdiction over issues regarding the existence and construction of collective bargaining agreements upon district courts).

soliciting employee interest in unionization.  Rite Aid immediately restricted the

representatives' access to the stores.  Local 1776 filed grievances with Rite Aid,

alleging that the company's action violated the CBAs.  Rite Aid commenced the

instant matter to determine the arbitrability of these grievances.  The parties have

filed cross-motions for summary judgment (Docs. 10, 13).  For the reasons that

follow, Rite Aid's motion for summary judgment (Doc. 13) will be granted, and the

union's motion (Doc. 10) will be denied.

## I.    <u>Statement of Facts</u>[2]

Rite Aid operates a nationwide chain of over 5,100 drugstores in twenty-eight

states and the District of Columbia.  (Doc. 16 ¶ 1; Doc. 20 ¶ 1.)  The three CBAs

presently at issue cover unionized Rite Aid stores in twenty-four Pennsylvania

counties.  (Doc. 16, Ex. A § 2.1.2; Doc. 16, Ex. B at § 2.1.2; Doc. 16, Ex. C at § 2.1.2.)[3]

The current versions of the CBAs were ratified in 2004 and were in effect when Rite

Aid acquired a drugstore chain formerly operated by Brooks Eckerd on

June 4, 2007.  (Doc. 15 ¶ 6; Doc. 16 ¶ 20; Doc. 18 ¶ 6; Doc. 20 ¶ 20.)  Several of the

newly acquired stores are located in the geographic territory covered by the

---

[2]In light the applicable standard of review, the court will present the facts in the light most favorable to the non-moving party with respect to each motion.  <u>See</u> <u>infra</u> Part II.

[3]For ease of reference the court will cite all three agreements collectively as "Doc. 16, CBAs."  Hence, a citation to "Doc. 16, CBAs § 9.6" refers to Section 9.6 in each of the three agreements.

Rite Aid–Local 1776 CBAs; however, Local 1776 does not represent the employees in any of these stores.  (Doc. 15 ¶ 7; Doc. 16 ¶ 21; Doc. 18 ¶ 7; Doc. 20 ¶ 21.)

During late September and early October 2007, representatives of Local 1776 attempted to enter six of the stores (hereinafter "the Brooks-Eckert stores") for the purpose of soliciting employee interest in unionization.  (Doc. 15 ¶ 9; Doc. 16 ¶¶ 25-26, 30-31, 35-36, 40-41, 45-46, 50-51; Doc. 18 ¶ 9; Doc. 20 ¶¶ 25-26, 30-31, 35-36, 40-41, 45-46, 50-51.)  Rite Aid barred the union representatives from entering the stores. (Doc. 15 ¶ 10; Doc. 16, Ex. F; Doc. 18, ¶ 10.)  On November 7, 2007, the union filed identical grievances under each of the three CBAs alleging that the denial of store access violated certain provisions thereof.  (Doc. 16, Ex. F.)

The grievances asserted that, during the decades preceding the instant dispute,[4] Rite Aid had observed a practice of granting union representatives unobstructed access to newly constructed and newly acquired stores to solicit employee interest in unionization.  (Doc. 15-3 at 2; Doc. 20, Ex. 1 ¶ 4.)  The union asserted that store access was protected by Articles 2, 5.1, and 15.3 of the CBAs. Article 2 of the CBAs (hereinafter "the recognition clause") provides as follows:

> [Rite Aid] recognizes the Union as the sole and exclusive bargaining agent for the purpose of bargaining in the Bargaining Unit in respect to rates of pay, wages, hours of employment, and other conditions pertaining to employment for . . . [a]ll full time and part time selling and non-selling associates employed at [Rite Aid] stores [within the counties identified in the CBAs].

---

[4]Though the CBAs became effective in 2004, the parties' past collective bargaining agreements apparently included clauses substantially similar to those at issue herein.  (Doc. 20, Ex. 1 ¶ 3-4.)

(Doc. 16, Ex. A §§ 2.1-2.1.2.)[5]  Article 5.1 (hereinafter "the observation clause")

grants Local 1776 the right to enter Rite Aid stores to ensure that the company has

complied with the terms of the CBAs:

> It is agreed that the Union duties and activities will not be carried on during hours of work.  This shall not prevent the Union officials from entering [Rite Aid] establishments to satisfy themselves that this Agreement is being observed, provided that same shall not interfere with the normal operations or business of the store.

(Doc. 16, CBAs § 5.1.)  Finally, Article 15.3 (hereinafter "the privileges clause")

governs Rite Aid's obligations with respect to certain benefits extended by the

company:

> Only privileges which have been granted by [Rite Aid] since its acquisition of the establishments covered by this Agreement shall be continued.  Privileges accorded by the previous owner, but not continued by [Rite Aid], shall not bind [Rite Aid].

(Id. § 15.3.)  None of the CBAs specify the nature of the "privileges" that this clause

protects.  Rite Aid rejected the union's store-access grievances, citing its "No

Solicitation" policy, under which "[s]olicitation for any cause or distribution of

material is prohibited if one or more of the Rite Aid Associates engaged in the

interaction is on working time."  (Doc. 16, Ex. G.)

---

[5]The court will quote all contractual language from the CBA covering Rite Aid's Northeast Division, (Doc. 16, Ex. A).  The analogous clauses of the other two CBAs substantially mirror the language contain in the Northeast Division agreement.  The only inconsistencies among the agreements appear in the numbering of clauses in Article 2 and in inconsequential variations in the language of Articles 2 and 5.1.

Local 1776 notified Rite Aid of its intent to arbitrate the store-access dispute pursuant to the arbitration provisions of the collective bargaining agreements. (Doc. 1 ¶ 61; Doc. 5 ¶ 61.)  The contracts' arbitration clause requires the parties to refer all grievances to arbitration unless a dispute exceeds the scope of the CBAs:

> No grievance shall be filed by . . . the Union, nor need [Rite Aid] entertain any grievance *that does not involve the interpretation of any provision of this Agreement.*

(Doc. 16, CBAs § 11.4 (emphasis added); <u>see also</u> <u>id.</u> § 11.2 (requiring arbitration of disputes)).

Rite Aid commenced the instant action to determine the arbitrability of the union's grievances.  The company contends that the pending grievances do not require interpretation of the clauses cited by Local 1776, thereby placing the dispute beyond the purview of the contracts' compulsory arbitration provision. Local 1776 responds that the dispute implicates the recognition, observation, and privileges clauses and must therefore be arbitrated.  The parties have fully briefed these issues, which are now ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary judgment the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see</u>

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently.  Cf. Assicurazioni Generali, S.P.A. v. Pub. Serv. Mut. Ins. Co., 77 F.3d 731, 733 & n. 2 (3d Cir. 1996) (observing that district court may dispose of case through cross-motions for summary judgment); see also 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa.1990).

## III.   Discussion

Rite Aid seeks a declaratory judgment that the store-access grievances fall beyond the reach of the CBAs' arbitration clause.  Three Supreme Court cases, known collectively as the Steelworkers Trilogy, govern the arbitrability of disputes arising under collective bargaining agreements.  See United Steelworkers v. Am Mfg. Co., 363 U.S. 564 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers v. Enter. Wheel & Car Co., 363 U.S. 593 (1960).  Under the Trilogy, a party may not be compelled to arbitrate unless it has

contractually agreed to do so.  <u>Warrior & Gulf</u>, 363 U.S. at 582; <u>Am. Mfg. Co.</u>, 363

U.S. at 570-71.  When a collective bargaining agreement contains an arbitration

provision, the merits of a dispute covered by the clause must be submitted to an

arbitrator.  <u>Am. Mfg. Co.</u>, 363 U.S. at 571.  Challenges to the arbitrability of a

dispute, however, remain matters for judicial determination.  <u>AT&T Techs. v.

Commc'ns Worker</u>, 475 U.S. 642, 649 (1986); <u>Trap Rock Indus. v. Int'l Union of

Operating Eng'rs</u>, 982 F.2d 884, 888 (3d Cir. 1992).  When reviewing arbitrability, the

court should avoid ruling on the merits of the underlying claim.  <u>AT&T Techs.</u>, 475

U.S. at 649-50; <u>Trap Rock Indus.</u>, 982 F.2d at 888.  The sole judicial function is to

determine whether "the party seeking arbitration is making a claim which on its

face is governed by the contract."  <u>United Steelworkers v. Rohm & Haas Co.</u>, 522

F.3d 324, 331 (3d Cir. 2008) (quoting <u>Am. Mfg. Co.</u>, 363 U.S. at 567-68).  The court

should grant a motion to compel arbitration "unless it may be said with *positive*

*assurance* that the arbitration clause is not susceptible of an interpretation that

covers the asserted dispute.  Doubts should be resolved in favor of coverage."

<u>AT&T Techs.</u>, 475 U.S. at 650 (quoting <u>Warrior & Gulf</u>, 363 U.S. at 582-83.); <u>Graphic

Commc'ns Int'l Union v. N. Am. Directory Corp.</u>, 98 F.3d 97, 101 (3d Cir. 1996).

However, the positive assurance standard does not require that remote misgivings

be resolved in favor of arbitration, and "a compelling case for nonarbitrability

should not be trumped by a flicker of interpretative doubt."  <u>Comm'n Workers v.

Am. Tel. & Tel. Co., 932 F.2d 199, 216 (3d Cir. 1991) (quoting PaineWebber, Inc. v.

Hartmann, 921 F.2d 507, 812 (3d Cir. 1990)).[6]

The United States Court of Appeals for the Third Circuit has identified three

inquiries that guide a court's application of these principles.  First, the court must

evaluate whether the grievance falls within the ambit of the arbitration clause.

Rohm & Haas, 522 F.3d at 331; E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of

---

[6]A presumption of arbitrability applies to all contracts that contain a broadly fashioned arbitration clause.  AT&T Techs., 475 U.S. at 650; Trap Rock Indus., 982 F.2d at 888 n.5.  Broad clauses feature inclusive language, such as provisions requiring "any differences arising with respect to the interpretation" of the contract be submitted to arbitration.  AT&T Techs., 475 U.S. at 650; see also, e.g., United Steel Workers Int'l Union v. E.I. DuPont De Nemours & Co., 549 F. Supp. 2d 585, 590 (D. Del. 2008).  Such clauses require all disagreements involving the CBA to be submitted to an arbitrator unless either the contract expressly exempts the dispute or the party seeking to avoid arbitration produces other "forceful evidence of a purpose to exclude the claim."  AT&T Techs., 475 U.S. at 650 (quoting Warrior & Gulf, 363 U.S. at 484-85); Rohm & Haas Co., 522 F.3d at 331.  In contrast, narrow arbitration clauses—such as those that limit arbitration to a few discrete types of disputes—receive no presumption of arbitrability.  See Int'l Bhd. of Elec. Workers v. Verizon N.J., Inc., 458 F.3d 305, 311 (3d Cir. 2006).

The arbitration provision at issue, which mandates arbitration unless a dispute "does not involve the interpretation of any provision" of the agreements, is broad in scope.  (Doc. 16, CBAs § 11.4.)  See, e.g., E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, 812 F.2d 91, 95 (3d Cir. 1987) (concluding that an arbitration clause covering "any dispute arising out of a claimed violation of this Agreement" was broad); Butler Armco Indep. Union v. Armco, Inc., 701 F.2d 253, 256-57 (3d Cir. 1983) (same with respect to a clause that granted the arbitrator "authority to interpret and apply the provisions of this Agreement only insofar as necessary to the determination of [a] grievance" (alteration in original); compare Verizon N.J., 458 F.3d at 311 (concluding that an arbitration clause was narrow because it expressly delineated which disputes were subject to arbitration).  A presumption of arbitrability therefore arises with respect to all disputes that implicate a contractual term.  This presumption notwithstanding, arbitration is not required for any dispute that fails to relate to a term of the CBAs.  Rohm & Haas, 522 F.3d at 332.

Teamsters, 812 F.2d 91, 95 (3d Cir. 1987).  The court may not compel arbitration of a matter beyond the reach of the clause.  If the dispute implicates the arbitration clause, however, the court must perform a second inquiry to determine whether any provision of the contract expressly exempts the dispute from arbitration.  Rohm & Haas, 522 F.3d at 331; E.M. Diagnostic Sys., 812 F.2d at 85.  If there is no express exemption, the third inquiry asks whether other "forceful evidence" indicates that the parties nonetheless intended to exclude the dispute from arbitration.  Rohm & Haas, 522 F.3d at 331; E.M. Diagnostic Sys., 812 F.2d at 85.

> **A.**     **The Store-Access Dispute Does Not Implicate Any Provision of the Collective Bargaining Agreements**

Bearing these principles in mind, the court turns to the contracts at issue, which require arbitration of all grievances unless a dispute "does not involve the interpretation of any provision" of the CBAs.  (Doc. 16, CBAs § 11.4.)  The court must therefore determine whether the store-access grievances pertain to a provision of the collective bargaining agreements.  Local 1776 contends that the grievances relate to the recognition clause, the observation clause, and the

privileges clause.  The court will evaluate the individual and collective reach of

these clauses to determine the cogency of the union's position.

This inquiry is not, as Local 1776 contends, an improper foray into the

substantive merits of the grievances.  While interpretation of contractual terms is

generally a matter reserved to the arbitrator, the Supreme Court has instructed

that federal courts may interpret contractual provisions insofar as necessary to

resolve the threshold question of arbitrability.  See Litton Fin. Printing Div. v.

NLRB, 501 U.S. 190, 209 (1991) ("Although doubts should be resolved in favor of

coverage, we must determine whether the parties agreed to arbitrate this dispute,

and we cannot avoid that duty because it requires us to interpret a provision of a

bargaining agreement." (internal citation and quotation omitted)); AT&T Techs.,

475 U.S. 651-52.  Indeed, the court "must determine the question of arbitrability,

even if that requires [consideration of] the underlying claim."  United Food &

Commercial Workers Union & Its Locals 45C & 776C v. PPG Indus. Inc., 236 F.

App'x 789, 792 n.4 (3d Cir. 2007); accord Litton, 501 U.S. at 209.  The party seeking

arbitration bears the burden of demonstrating that its grievance falls within the

scope of the arbitration clause.  Rohm & Haas, 522 F.3d at 332.  Merely citing to

particular contractual provisions is insufficient to carry this burden.  E.M.

Diagnostic Sys., 812 F.2d at 95.  Rather, the court must confirm that "the grievance

submitted through the . . . grievance procedure . . . arise[s] from some specific

article" of the agreement.  Rohm & Haas, 522 F.3d at 332; Kaplan v. First Options of

Chi., Inc., 19 F.3d 1503, 1516 (3d Cir. 1994) (cautioning that courts should not invoke

federal policy favoring alternative dispute resolution as a basis for compelling

arbitration of matters beyond the scope of a contractual agreement).  The court's

role is not to adjudicate the actual existence of the disputed right but instead to

determine whether the face of the grievance states a claim that could plausibly

implicate a provision of the CBA.  Am. Mfg. Co., 363 U.S. at 568; Sharon Steel Corp.

v. Jewell Coal & Coke Co., 735 F.2d 775, 778 (3d Cir. 1984).

Local 1776 claims that these principles apply solely to cases associated with

the vesting of certain employee benefits and are therefore inapplicable to the

instant dispute.  (Doc. 22 at 3-4.)  The court, however, does not read Litton and its

progeny so narrowly.  Litton conducted its arbitrability analysis under the same

line of cases that govern this matter, including Warrior & Gulf and AT&T

Technologies.  Since Litton's issuance, federal courts have applied it in a variety of

contexts, including motions to compel arbitration.  See, e.g., Int'l Bhd. of Elec.

Workers, Local 1 v. GKN Aerospace N. Am., 431 F.3d 624, 628-29 (8th Cir. 2005);

Indep. Lift Truck Builders Union v. Hyster Co., 2 F.3d 233, 235-36 (7th Cir. 1993);

N.C. Mail Haulers & Postal Labor Local 8001 v. E. Coast Leasing, Inc., No.

1:06CV00840, 2006 WL 3068497, at *3 (M.D.N.C. Oct. 27, 2006); Terre Haute

Newspaper Guild, Local No. 46 v. Thomson Newspapers, Inc., 68 F. Supp. 2d 1028,

1032-33 (S.D. Ind. 1999).  The court therefore concludes that Litton furnishes the

controlling legal principles here.

Application of Litton is consistent with the Third Circuit's admonition that

the grievance at issue must fall within the ambit of the CBA.  Rohm & Haas, 522

11

F.3d at 332.  Holding that a grievance does not implicate the terms of a CBA
necessarily affects the merits of the underlying claim.  Nevertheless, the court may
not compel arbitration simply because refusing to do so influences the merits of the
dispute.  Before compelling arbitration, the court must be satisfied that the dispute
actually implicates a contractual term.  This inquiry requires the court to
"determin[e] whether it [i]s 'possible' for an arbitrator, consistent with the plain
meaning of the agreement, to rule in favor of the party demanding arbitration."
GKN Aerospace, 431 F.3d at 628.  The court will therefore look to the contractual
language of the recognition, observation, and privileges clauses to determine
whether they are individually or collectively susceptible to an interpretation that
creates the store-access right propounded by Local 1776.

## 1.   The Recognition Clause

Recognition clauses frequently appear in collective bargaining agreements in
the retail industry and serve several discrete functions.  First, the clauses identify
the employees who are subject to the collective bargaining agreement.  See NLRB
v. Greensburg Coca-Cola Bottling Co., 40 F.3d 669, 673 (3d Cir. 1994); United Indus.
Workers (Local #16) v. Gov't of the V.I., 987 F.2d 162, 170 n.5 (3d Cir. 1993); Boeing
Co. v. NLRB, 581 F.2d 793, 796 (9th Cir. 1978) (holding that a recognition clause
defines which particular people are subject to the contract).  The clauses may
exempt certain employees from the bargaining unit or exclude a local's national
union as a party to the contract.  See, e.g., NLRB v. Wooster Div. of Borg-Warner
Corp., 356 U.S. 342, 345-46 (1958) (recounting that company insisted on a

12

recognition clause that would have excluded the national union as party to the collective bargaining agreement and concluding that absolute insistence on such a provision violated the National Labor Relations Act).  Hence, by ratifying a recognition clause, the employer formally acknowledges that the union serves as the collective bargaining agent for all employees within the contractually defined bargaining unit.

Second, recognition clauses may also define matters subject to collective bargaining.  The clauses, which generally track language from § 8 of the National Labor Relations Act, may impose an obligation upon the employer to bargain in good faith with the union pertaining to matters enumerated in the clause.  See, e.g., Va. Mason Hosp. v. Wash. State Nurses Ass'n, 511 F.3d 908, 915 (9th Cir. 2007) (concluding that arbitrator acted within the scope of his authority when concluding that a recognition clause imposed a contractual obligation to bargain over the conditions of employment).  Such matters typically includes wages, hours, and conditions of employment.  See 29 U.S.C. § 158(d).

Finally, recognition clauses may restrict an employer's right to insist upon a secret ballot election before recognizing a union as the bargaining representative for stores that the employer opens or acquires after ratification of the CBA.  See Houston Div. of the Kroger Co. (Kroger I), 208 N.L.R.B. 928, 928 (1974), rev'd sub nom. Retail Clerks In'tl Ass'n Local No. 455 v. NLRB, 510 F.2d 802 (D.C. Cir. 1975); Houston Div. of the Kroger Co. (Kroger II), 219 N.L.R.B. 388, 389 (1975).  This principle derives from the well-settled rule that a union may not automatically

induct employees at newly acquired or constructed stores into its ranks without the employees first expressing a desire to be represented by the union.  See 29 U.S.C. § 157; Kroger II, 219 N.L.R.B. at 389; Retail Clerks Union, Local 870 (White Front Stores, Inc.), 192 N.L.R.B. 240, 242 (1971).  Typically, an employer may demand that employees participate in a secret ballot election before recognizing the union as the bargaining representative at new locations.  See 29 U.S.C. § 159(c)(1)(B); U.S. Gypsum Co., 157 N.L.R.B. 652, 656 (1966).  However, when a recognition clause appears in a CBA with a preexisting union and expressly addresses after-acquired stores or purports to cover automatically all employees of such stores, the clause operates as a waiver of the employer's secret-ballot rights.  Kroger II, 219 N.L.R.B. at 389.  By ratifying such clauses, the employer agrees to acknowledge the union upon a showing that it possesses the support of a majority of the store's employees.[7] Id.

Despite ample precedent interpreting recognition clauses, Local 1776 has not cited, nor has the court independently identified, any case in which either a federal court or the National Labor Relations Board held that a recognition clause implicated the store-access right sought by the union.  The lack of any precedent to this effect is not surprising in light of the well-settled tenet of labor law that an

---

[7]The recognition clause contained in the instant CBAs is substantively identical to one of the clauses at issue in the Kroger decisions.  Compare (Doc. 16, CBAs art. 2), with Kroger I, 208 N.L.R.B. at 928.  However, it is undisputed that Local 1776 does not currently possess the support of a majority of employees at the Brooks-Eckert stores.

employer may exclude union organizers from its premises when the union possesses alternative access to employees.  NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112 (1956); accord Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 217 n.21 (1994); Metro. Dist. Council of Phila. & Vicinity United Bhd. of Carpenters & Joiners v. NLRB, 68 F.3d 71, 74-75 (3d Cir. 1995); Gary E. Calkins & Anna Rosa Calkins, 323 N.L.R.B. 1138, 1141 (1997), enforced 187 F.3d 1080 (9th Cir. 1999). Local 1776 does not contend that it lacks access to employees outside of the workplace, and Rite Aid therefore incurs no obligation to allow union representatives to enter the Brooks-Eckert stores.  Neither the language of the instant recognition clause nor the storied legal history of such clauses indicates that the company's right of exclusion has been compromised through the collective bargaining process.  Hence, the recognition clause is not "susceptible of an interpretation that covers the asserted dispute."  Warrior & Gulf, 363 U.S. at 582-83.

  **2.**   **The Observation Clause**

  Local 1776 next contends that the observation clause creates a right of access to the Brooks-Eckert stores.  The observation clause grants the union the right to "enter[ Rite Aid's] establishments to *satisfy that th[e] Agreement is being observed.*" (Doc. 16, CBAs § 5.1 (emphasis added)).  Local 1776 concedes that it does not represent the employees of the Brooks-Eckert stores and that the CBAs do not governed these individuals' employment. *A fortiori*, the union cannot ensure compliance with the CBAs at a facility to which the contracts do not apply, and the

observation clause is facially inapplicable to the present dispute.  Hence, the

observation clause has no bearing on the union's grievances.

###    3.    **The Privileges Clause**

Local 1776 lastly relies upon the privileges clause to support its claim of

arbitrability.  This clause mandates that "[o]nly privileges which have been granted

by the present Employer since its acquisition of the establishments covered by this

Agreement shall be continued."  (Doc. 16, CBAs. § 15.3.)  The contracts do not

define the term "privileges."  The court must therefore evaluate whether an

arbitrator could interpret the clause in a manner that covers the instant dispute.

Warrior & Gulf, 363 U.S. at 583-84; Int'l Bhd. of Elec. Workers, Local 1 v. GKN

Aerospace N. Am., 431 F.3d 624, 628-29 (8th Cir. 2005).[8]  To be perfectly clear, the

court expresses no opinion regarding the *actual* scope of the clause:  The court's

sole function is to determine whether an arbitrator *could* interpret the clause in a

manner that covered the union's grievances.  See Graphic Commc'ns Conference v.

Buck County Courier Times, No. 06-05452, 2008 WL 3889591, *7 (E.D. Pa.

Aug. 18, 2008) (observing that "any judicial determination regarding arbitrability

should focus only on the agreement").

---

[8]Local 1776 contends that this inquiry must be submitted to an arbitrator.
(Doc. 14 at 6.)  This is incorrect.  The parties are entitled to a judicial determination
on the question of arbitrability, Trap Rock Indus., 982 F.2d at 888, and the court
may evaluate the provisions of the CBAs insofar as necessary to dispose of this
issue, Litton, 501 U.S. at 209; PPG Indus., 236 F. App'x at 792 ("[A] court may need
to decide the merits of the underlying claim in order to decide arbitrators'
jurisdiction").  See also supra pp. 10-12.

A court confronted with an ambiguous provision in a collective bargaining agreement looks to the common law of contracts to define the parameters of the term.  See Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1284 (3d Cir. 1991).  A court must endeavor to interpret the term in a manner consistent with other provisions of the contract, and the context in which the term appears frequently provides a useful device for ascertaining contractual intent.  See U.S. Claims, Inc. v. Yehuda Smolar, PC, --- F. Supp. 2d ---, 2009 WL 596459, at *9 (E.D. Pa. 2009); State Farm Mut. Auto. Ins. Co. v. Moore, 544 A.2d 1017, 1019 (Pa. Super. Ct. 1988).

The privileges clause appears in Article 15 of the instant CBAs, which is entitled "Miscellaneous Working Conditions."  (Doc. 16, CBAs art. 15.)  In the labor law context, *working conditions* is a judicially defined term that "encompass[es] the physical surroundings of a worker at the place of employment."  Rohm & Haas, 522 F.3d at 333 (collecting cases).  While titles and headings in an agreement are not dispositive of contractual intent, the provisions of Article 15 harmonize with this definition.  The article contains a total of fifteen numbered clauses including the privileges clause.  Nearly all of these provisions govern the daily rules, regulations, and conditions under which individual employees perform their job functions.  For example, the article requires that certain workplace rules be posed for the benefit of employees, (Doc. 16, CBAs § 15.2), that the company furnish employee uniforms, (id. § 15.5), and that a secure area be provided for storage of employees' personal belongings, (id. § 15.6.2).  It delineates the circumstances under which employees

17

may be held personally liable for shortages in cash tills, (id. § 15.6.1), creates

procedures for employees to transfer to open positions within a store, (id. § 15.8),

and entitles employees to utilize the company's discount policy, (id. § 15.9).

Article 15 defines the term "continuous service" for purposes of certain employee

benefits, (id. § 15.7), and it establishes regulations for employee compensation, (id.

§§ 15.4.1-.4.5).  It also obligates the union to issue a union store card to Rite Aid

upon verification that the company has complied with the terms of the CBAs.  (Id.

§ 15.1).

The scope of the privileges clause must be construed consistent with its

context.  Against this backdrop, it is clear that the clause does not, as Local 1776

suggests, transform *any* benefit that Rite Aid confers upon the union into a

contractual obligation.  Instead, the clause's sister provisions limit its reach.  The

provisions of Article 15 govern the daily operation of Rite Aid stores and delineate

the company's obligations to employees *in the daily performance of their jobs*.  The

article contains provisions designed primarily to protect employees as individuals

and to bring structure to their workplace environment.[9]  The provisions thereof

have relatively little effect on the systemic relationship between the union as

---

[9]For example, the privileges clause might address matters such as when
employees may go to lunch, whether the company must provide equipment
associated with their jobs, or the extent to which they may be assigned tasks outside
of their formal job descriptions.  Of course, the court provides these examples for
illustrative purposes only and does not hold that such matters actually fall within
the ambit of the clause *sub judice*.

employees' bargaining representative and the company,[10] and the privileges clause

must be read in this light.  The court concludes that the reach of the clause is no

broader than the quotidian duties and obligations that the other provisions of

Article 15 address.  Holding that the store-access grievances pertain to the

privileges clause would require one to ignore the provision's context and to imbue it

with a post-grievance interpretation that is unsupported by the larger framework of

collective bargaining.  The court will not give such a tortuous reading to this

contractual provision.  Hence, the site-access grievance does not relate to the

privileges clause, and Local 1776 may not invoke it to impose an obligation of

arbitrability.

### 4.    <u>The Collective Effect of the Clauses</u>

Local 1776 alternatively argues that the recognition, observation, and

privileges clauses collectively create a right of store access even if each clause fails

to do so individually.  The union has not explained how the scope of these clauses

broadens when they are read in tandem, and the court has ascertained no

---

[10]This holding does not trivialize the significance of Article 15 and is merely a reflection of the article's purpose.  Certain contractual provisions, such as Article 2 (concerning recognition), Article 4 (concerning union security and dues), and Article 19 (concerning union stewards), delineate the relationship between Rite Aid and Local 1776 as the bargaining representative for dozens of stores and hundreds of employees.  Such provisions have relatively little effect upon the manner in which employees discharge their employment duties on a day-to-day basis.  The union's alleged right of store access is of this character.  On the other hand, Article 15 governs individual employee's daily work environment and leaves the systemic relationship between the union and the company to be addressed by other contractual provisions.  The site-access grievance is therefore starkly out of place when inserted among the provisions of this article.

construction of the clauses *in pari materia* which would reach the instant dispute.

Accordingly, the court concludes that the store access grievance does not implicate

the clauses cited by the union, either individually or collectively.  The union's

grievances do not "involve the interpretation of any provision" of the CBAs, and

Rite Aid is not obligated to submit the instant dispute to arbitration.  (<u>Id.</u> § 11.4.)[11]

### B.   <u>The CBAs Create No Right of Store Access Because Rite Aid and Local 1776 Have Not Bargained About Such Matters</u>

Several additional factors bolster the court's conclusion that the store-access

grievances are not arbitrable.  First, the CBAs reveal that Rite Aid and Local 1776

contemplated the opening of new stores during the bargaining process yet omitted

the store-access rights currently sought by the union.  Article 25 of the CBAs

provides that Rite Aid "shall have the right *to open new establishments of any kind*[

---

[11]Local 1776 contends that referral to arbitration is proper in any event because the appropriate remedy for an arbitral award that exceeds the scope of the CBAs "is a suit to vacate the award, not a judicial order precluding arbitration." (Doc. 21 at 5.)  The union cites <u>E.M. Diagnostic Systems</u> and <u>Hartford Aircraft Lodge 743, Int'l Ass'n of Machinists v. Hamilton Sundstrand Corp.</u>, 213 F. App'x 31 (2d Cir. 2007), in support of this proposition.  These cases are inapposite.  In both <u>E.M. Diagnostic</u> and <u>Hamilton Sundstrand</u>, the court concluded that the union's grievance pertained to particular terms of the collective bargaining agreement. <u>Hamilton Sundstrand</u>, 213 F. App'x at 33; <u>E.M. Diagnostic</u>, 812 F.2d at 96.  The grievances were referred to arbitration because they required interpretation of a contract term, and the defendant could move to vacate the arbitral awards in the event that the arbitrator exceeded the scope of his or her contractual authority. Here, by contrast, Local 1776 has failed to demonstrate that its grievances implicate a term of the CBAs.  *Any* conclusion that the arbitrator reached in the union's favor would be an abuse of the arbitrator's jurisdiction because the CBAs do not grant the arbitrator contractual authority to hear the dispute in the first instance.  Hence, <u>E.M. Diagnostic</u> and <u>Hamilton Sundstrand</u> are inapplicable, and the union may not invoke them to compel a futile exercise in arbitration.

and to] transfer, relocate, close or suspend any establishment or operation." (Id. § 25.1.)  Article 2.3 of the agreement covering the greater Philadelphia area requires the company to "notify the Union of any new store openings or acquisitions" within the territory covered by the CBA.  (Doc. 16, Ex. B § 2.3.)  Although boilerplate, these provisions demonstrate that Rite Aid and Local 1776 considered the acquisition and construction of additional stores during the bargaining process.  The alleged right to access the Brooks-Eckert stores directly relates to these issues.  Had the contacting parties intended to allow the union to enter newly acquired stores, provisions securing a right of access would presumably would appear alongside clauses such as Articles 25 and 2.3.  The omission of such safeguards among provisions that would be their kin strongly suggests that Rite Aid and Local 1776 did not intend to create them.

Second, ample evidence reflects that unions and employers frequently address property-access rights through the collective bargaining process.  In fact, Rite Aid has extended store-access rights on at least one occasion to a sister chapter of Local 1776, as recounted in Rite Aid of N.Y., Inc. v. United Food & Commercial Workers Int'l Union Local One, No. 07-CV-708, 2009 WL 185764 (W.D.N.Y. Jan. 23, 2009).  The grievance in Rite Aid of N.Y. arose under circumstances identical to this case.  Representatives of the defendant union attempted to enter newly acquired Rite Aid stores following the Brooks-Eckert acquisition and were refused entry.  Id. at *2.  The union filed a grievance, and Rite Aid sought to stay arbitration.  Id.  Like in the instant matter, the recognition clause required Rite Aid to apply the CBA to

21

newly acquired and newly opened stores upon a showing of majority support for the
union, (Doc. 2, Ex. A § 1.4 in Rite Aid of N.Y., No. 07-CV-708 (W.D.N.Y.)), and the
arbitration clause applied to all disputes implicating "questions of the
interpretation or application" of CBA provisions, (id. § 19.1).[12]  However, the CBA
contained an additional clause that granted "[r]epresentatives of the Union . . . the
right to visit the Employer's place of business at any time during working hours *for
the purpose of whether [sic] the associates wish the Union to represent them . . . .*" (Id.
§ 25.1.)  The court evaluated this express guarantee of store access and concluded
that the union's grievance implicated terms of the CBA.  Rite Aid of N.Y., 2009 WL
185764, at *2, 5-6.  The pending case is critically distinguishable from Rite Aid of
N.Y. in that the present CBAs feature no store-access clause.  Whereas Rite Aid of
New York required an arbitrator to assess the effect of the store-access clause on

---

[12]The court takes judicial notice of the CBA appearing at Exhibit A to Docket
Entry No. 2 on the docket for Rite Aid of N.Y., No. 1:07-CV-0708 (W.D.N.Y). See
FED. R. EVID. 201(c), (f); Cooper v. Pa. State Att'y Gen., No. 2:06cv1332, 2007 WL
2492726, at *2 (W.D. Pa. Aug.30, 2007) (reiterating that a federal court may take
judicial notice of court records and dockets).

the dispute, the present matter contains no similar clause in need of an arbitrator's

discerning judgment.[13]

Numerous other sources confirm that unions characteristically bargain for

access to an employer's property for the purpose of union organizing.  See, e.g.,

NLRB v. Local 348-S, United Food & Commercial Workers Int'l Union, 273 F.

App'x 40, 41 (2d Cir. 2008) (documenting that the union bargained for a neutrality

agreement from employer, which included the right to enter employer's premises);

---

[13]1199 SEIU, United Healthcare Workers East v. Rite Aid Corp.,
No. 07 CV 4816, 2008 WL 762090 (S.D.N.Y. Mar. 24, 2008), also arose in the context
of the Brooks-Eckert merger but is unavailing to Local 1776.  In 1199 SEIU, Rite
Aid and the union were parties to both a CBA and a neutrality agreement, which
prohibited the company from impeding unionization efforts.  Id. at *1.  The CBA,
like the agreements at issue here, required Rite Aid to recognize the union as the
bargaining representative at new locations upon a showing of support by a majority
of employees.  Id.  The parties agreed that the CBA was in effect at the time of the
acquisition but disputed the applicability of the neutrality agreement.  Id. at *1 n.2.
After the merger, Rite Aid began an anti-union campaign in an attempt to operate
newly acquired stores under "a union-free business model."  Id. at *1  The union
initially challenged the campaign on the ground that it was a breach of Rite Aid's
recognition obligations under the CBA, and later asserted that the company's
activities violated the neutrality agreement as well.  Id. at *3 & n.5.  The court noted
that applicability of the neutrality agreement was unclear and concluded that the
union's grievance concerning Rite Aid's proactive anti-union activity plausibly
stated a violation of Rite Aid's recognition obligations under both the CBA and the
neutrality agreement.  Id.  It therefore granted the union's motion to compel
arbitration.  Id. at *4.

The present matter presents a more tenuous relationship between the
express obligations created by the CBA and the store-access right alleged by the
union.  Unlike 1199 SEIU, in which the parties had entered an express neutrality
agreement, Local 1776 contends that a right of store access can be implied from a
series of CBA provisions in a manner wholly unsupported by case law.  Indeed,
neither industry practice nor judicial precedent demonstrates that a right of store
access can plausibly be distilled from the contractual provisions identified by the
union.  See supra Part III.A.  Hence, the instant dispute is beyond the realm of both
the instant CBAs and 1199 SEIU.

Hotel Employees & Rest. Employees Union, Local 57 v. Sage Hospitality Res., 299
F. Supp. 2d 461, 465 (W.D. Pa. 2003) (same); William John Bux & Miranda Tolar,
Houston Janitors & the Evolution of Union Organizing, 70 Tex. B.J. 426, 427-28
(2007) (observing that employers typically ratify neutrality agreements—which
often incorporate a right of access to the employer's property—in response to union
pressure consistent with the bargaining process); Larry W. Bridgesmith & John
E.B. Gerth, The Summer of Union Discontent Portends a Season of Employer
Discomfort, 39 J. Health L. 117, 130-32 (2006) (same); Adrienne E. Eaton & Jill
Kriesky, Union Organizing under Neutrality & Card Check Agreements, 55 Indus.
& Lab. Rel. Rev. 42, 47 (2001) (reviewing 132 bargained-for neutrality agreements
and observing that approximately two-thirds of them included clauses granting
unions access to employer property for the purpose of union organizing).
Local 1776's union's position that the recognition, observation, and privileges
clauses impliedly create store access rights ignores the trend favoring collective
bargaining on such matters.  As a matter of policy, labor jurisprudence generally
regards the right of access to employer property as a matter to be negotiated.  If
ubiquitous contractual provisions such as recognition clauses created the right
Local 1776 now seeks, there would hardly be a need for the extensive store-access
bargaining that commentators have chronicled.  See Eaton & Kriesky, supra, at 47-
48.  This trend fortifies the court's conclusion that Rite Aid's CBAs are not
susceptible to the interpretation proposed by the union.

### C.   Local 1776's Past Practice Alone Is Insufficient to Establish the Arbitrability of the Store-Access Grievances

Finally, Local 1776 contends that the parties' past practice renders the instant dispute subject to the arbitration clause.  Under contract law principles, a court may rely upon past practice to resolve an ambiguity otherwise incapable of resolution or to bring meaning to a provision that "cries out for an implied term." Quick v. NLRB, 245 F.3d 231, 248-49 (3d Cir. 2001) (quoting U.A.W. Local 1697 v. Skinner Engine Co., 188 F.3d 130, 146 (3d Cir. 1999)).  However, a party may not invoke extrinsic evidence to "add terms to a contract that *is plausibly complete without them.*"  Id. (emphasis added) (quoting Skinner Engine Co., 188 F.3d at 146); see also Zylla v. Unisys Corp., 57 F. App'x 79, 85-86 (3d Cir. 2003) (holding that a court should not allow a party to introduce past practice to controvert the language of a contract that is otherwise unambiguous).  As discussed above, the recognition, observation, and privileges clauses function as logical, integrated components of the CBAs.  The agreements, read as a whole, do not create a contractual ambiguity that requires resolution through analysis of past practice.[14]  Accordingly, the court concludes that Local 1776 may not rely upon such practice to create a right of

---

[14]This holding is consistent with the court's assessment of the privileges clause.  Although the clause is ambiguous when viewed in isolation, it becomes clear when perceived in the context of Article 15.  See supra Part III.A.3.  Hence, a full reading of the CBAs demonstrates that the clause does not cover the right of store access alleged by the union, thereby obviating the need for extrinsic evidence.  See Gleason v. Norwest Mort., Inc., 243 F.3d 130, 138-39 (3d Cir. 2001) ("Whether a contract is ambiguous depends on the meaning assigned to words or phrases in accordance with the apparent purpose of the contract as a whole.")

access to Rite Aid stores when the provisions of the CBAs do not implicate such a right.[15]

## IV.   Conclusion

      The CBAs between Rite Aid and Local 1776 require arbitration of all disputes that require interpretation of a provision thereof.  The union's store-access grievances do not relate to the recognition, observation, or privileges clauses, and the are therefore not "susceptible of an interpretation that covers the asserted dispute."  Warrior & Gulf, 363 U.S. at 582-83.  This conclusion reflects industry practice of negotiating such rights through the collective bargaining process.  The court therefore concludes that the parties have not contractually agreed to arbitrate the instant dispute.  Rite Aid's motion for summary judgment will be granted, and Local 1776's motion will be denied.

      An appropriate order is attached.

                    S/ Christopher C. Conner
                    CHRISTOPHER C. CONNER
                    United States District Judge

Dated:      March 31, 2009

---

[15]Local 1776 apparently presumes that a contractual obligation requiring store access is the *only* rationale for Rite Aid's alleged past practice.  However, the union has introduced no evidence to that effect.  Rite Aid may have abided past store entry by the union for any number of reasons.  The company may have been ignorant of the practice or may have been indifferent to unionization efforts.  More likely, perhaps, it chose to vouchsafe a license to access its stores to maintain rapport with the union.  Regardless of the reasons underlying the past practice, the instant dispute presents a compelling case of nonarbitrability.  The court cannot discard the weight of logic in favor of a pale "flicker of interpretative doubt" that may arise from union's proffered interpretation of ambiguous past practice.  Am. Tel. & Tel. Co., 932 F.2d at 216.  The parties' past practice alone cannot bring the store-access dispute within the ambit of the CBAs.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RITE AID OF PENNSYLVANIA, INC.,** | : | **CIVIL ACTION NO. 1:08-CV-0033** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED FOOD AND COMMERCIAL** | : | |
| **WORKERS UNION, LOCAL 1776,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 31st day of March, upon consideration of the motions for

summary judgment (Docs. 10, 13), and, for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. The motion for summary judgment (Doc. 10) filed by defendant United
Food and Commercial Workers Union, Local 1776 ("Local 1776") is
DENIED.

2. The motion for summary judgment (Doc. 13) filed by plaintiff Rite Aid
of Pennsylvania, Inc. ("Rite Aid") is GRANTED.

3. The Clerk of Court is instructed to enter JUDGMENT in favor of Rite
Aid and against Local 1776 on all claims.

4. The Clerk of Court is instructed to CLOSE this case.

      S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge